778 P.2d 602

**STATE of Arizona, Appellee,**

v.

**Oreste C. FULMINANTE, Appellant.**

**No. CR–86–0053–AP.**

Supreme Court of Arizona,
In Banc.

June 16, 1988.
Reconsideration Granted April 11, 1989.
Supplemental Opinion July 11, 1989.
Reconsideration Denied Sept. 19, 1989.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Barbara A. Jarrett, Asst. Attys. Gen., Phoenix, for appellee.

Dean W. Trebesch, Maricopa County Public Defender by James H. Kemper and Stephen R. Collins, Maricopa County Deputy Public Defenders, Phoenix, for appellant.

CAMERON, Justice.

## I.  JURISDICTION

Defendant, Oreste C. Fulminante, appeals a verdict and judgment of guilt for the crime of first degree murder (A.R.S. § 13–1105(A)(1)) and a sentence of death (A.R.S. § 13–703). We have jurisdiction pursuant to Ariz. Const. Art. 6 § 5(3) and A.R.S. §§ 13–4031, 4033, and 4035.

## II.  ISSUES

Defendant raises the following issues on appeal:

A.  Trial Issues:
1.  Did the trial court err in determining that a paid informant for the Federal Bureau of Investigation did not violate defendant's fifth amendment rights?

2. Did the trial court err in holding that defendant's confession to Anthony Sarivola was voluntarily made?

3. Did admission of defendant's statement to Anthony Sarivola violate defendant's sixth amendment right to counsel?

4. Did the trial court err in admitting defendant's statements to Donna Misch (Sarivola) because the statements were the "fruit of the poisonous tree"?

5. Did the trial court err in admitting a photograph of the victim into evidence?

6. Did the trial court err in admitting evidence regarding defendant's bad character and his prior bad acts?

7. Did the trial court err in precluding defendant from presenting evidence that a third party committed the murder?

8. Did the trial court err in allowing the prosecutor to present evidence regarding the informant's truthful character?

9. Did the trial court err in allowing the prosecutor to elicit testimony from a police officer regarding his reasons for suspecting defendant was the murderer?

B. Death Penalty Issues:

1. Are the terms "cruel, heinous, or depraved" void for vagueness?

2. Did the trial court abuse its discretion in sentencing defendant to death?

3. Does the defendant have a constitutional right to a voir dire examination of the trial judge in a death penalty case?

4. Is Arizona's death penalty statute unconstitutional because it requires imposition of the death penalty when one aggravating circumstance exists and there are no mitigating factors?

5. Is Arizona's death penalty statute unconstitutional because it allegedly lacks standards for evaluating aggravating and mitigating circumstances?

6. Is Arizona's death penalty statute unconstitutional because it shifts the burden of proof regarding mitigating ciucumstances to the defendant?

7. Is Arizona's death penalty statute unconstitutional because it violates defendant's sixth amendment right to a jury trial on the issue of the sentence of death?

8. Must this court, in its independent review of the evidence, find that the death sentence is inappropriate punishment in this case?

C. Post–Trial Issues:

1. Was defendant denied his constitutional right to the effective assistance of counsel by his trial attorney?

### III. FACTS

Defendant called the Mesa Police Department on the morning of 14 September 1982, to report the disappearance of his eleven-year-old stepdaughter, Jeneane Michelle Hunt. Shortly thereafter he drove to a hospital to pick up his wife Mary, (Jeneane's mother) who had just been released following surgery. He told Mary that the victim had not returned home the previous evening.

On 16 September 1982, the body of a young girl, later identified as Jeneane, was discovered in the desert in east Mesa. The victim had been shot twice in the head with a large caliber weapon at close range and a ligature was found around her neck. Testimony of the pathologist indicated that the ligature found around the victim's neck did not contribute to her death, although it could have been used to effect non-fatal choking prior to death. Additionally, tests for spermatazoa and seminal fluids were negative. However, this was not unexpected given the decomposing condition of the body.

Because of a number of inconsistencies in defendant's statements concerning the victim's disappearance, particularly his claims that the victim was instructed in the use of firearms and that he had a good relationship with the victim, the defendant

became a suspect in the killing. Defendant's wife stated that the relationship between the defendant and victim was poor and that the defendant had never instructed the victim in use of firearms. However, no charges were filed at that time and defendant left the state of Arizona for New Jersey.

During the investigation, police learned that on 13 September 1982 defendant had gone to a Mesa gun shop to trade a rifle for an extra barrel for his .357 revolver. Additionally, police learned defendant had a prior criminal record including a 1965 New Jersey felony conviction for impairing the morals of a child, and a 1971 New Jersey conviction for uttering a check with a forged endorsement. The police informed federal authorities of the Alcohol, Tobacco, and Firearms Bureau of facts gathered during the investigation, and on 28 October 1982, defendant was arrested in Newark, New Jersey for violating 18 U.S. C.App. § 1202(a), possession of a firearm by a felon. The defendant was transported to Phoenix, convicted in the U.S. District Court for the offense, and sentenced to a minimum of two years in the Federal Prison in Springfield, Missouri. On release from Springfield, he was again arrested on another charge of possessing a firearm. He was convicted and received another two year sentence.

This time defendant was sent to the Ray Brook Federal Correctional Institution in New York. While in Ray Brook, defendant became friends with another inmate, Anthony Sarivola, who was serving a 60–day sentence for extortion. Sarivola, who was once involved with organized crime, had by this time become a paid informant for the Federal Bureau of Investigation. In Ray Brook, Sarivola masqueraded as an organized crime figure.

After Sarivola and defendant became friends, Sarivola heard a rumor that defendant was suspected of killing a child in Arizona. Sarivola asked defendant about the rumor, but defendant denied that it was true. Sarivola told his contact in the Federal Bureau of Investigation, Agent Walter Ticano, about the rumor. Agent Ticano told Sarivola to find out more about the rumor.

At this time, according to Sarivola, defendant had been receiving "rough" treatment from the other inmates concerning the rumor, so Sarivola told defendant that if he would tell him the truth, Sarivola would give him help. On 20 October 1983 defendant admitted to Sarivola that he had taken his stepdaughter out to the desert on his motorcycle, and then shot her twice in the head with his .357 revolver. Defendant further told Sarivola that he choked, sexually assaulted, and made the victim beg for her life before shooting her. He also stated that he hid the murder weapon in a pile of rocks at the murder scene.

Sarivola was released from Ray Brook on 28 November 1983. Defendant was released in May of 1984. Sarivola and his fiancee, Donna, picked up defendant at a local bus terminal. Donna asked defendant if he had any relatives or friends he wished to see. Defendant indicated he could not return to his home because he had killed a little girl in Arizona. They drove defendant to a friend's house in Pennsylvania. In June 1984, defendant was arrested in New York for another weapons violation.

On 4 September 1984 defendant was indicted for first degree murder, pursuant to A.R.S. § 13–1105. Prior to trial, defendant moved to suppress evidence of the statements made to Sarivola and Donna. The trial court denied his motions.

On 19 December 1985, defendant was found guilty by a jury of first degree murder of his stepdaughter. The trial court found in its special verdict that the murder was committed in an especially cruel, heinous and depraved manner. The trial court found there were no mitigating circumstances sufficient to overcome the aggravating circumstances and sentenced defendant to death. This appeal follows.

### A. Trial Issues

### 1. MIRANDA WARNINGS

Defendant initially contends that he was subjected to custodial interrogation by Sarivola in violation of the fifth amendment to the United States Constitution. As a re-

sult, he claims the statements made to Sarivola were inadmissible because they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

In response to defendant's motion to suppress these statements, the trial court ruled:

The Court finds that the alleged statements contained in the State's Response (which was adopted by the Defendant for purposes of this hearing only) do not fall within the Miranda parameters. The Court does not find that at the time the statements were made that the Defendant was in custody or deprived of his freedom in a significant way. Although the Defendant was in a Federal Correctional Institution, there was no "custodial interrogation". In determining whether there was a custodial interrogation, the Court has considered 1) the site of the interrogation, 2) whether the investigation had focused on the suspect, 3) whether the objective indicia of arrest were present and 4) the length and form of the interrogation. *State v. Kennedy*, 116 Ariz. 566, 570 P.2d 508 [(App.1977)].

Although the site of the statements given in this case was at a Federal Correctional Institution, the Court finds that no investigation had yet focused on the Defendant, there was no objective indicia of arrest with respect to this matter, and the length of the conversation was minimal.

The Court has reviewed the case of *Mathis v. United States*, 391 U.S. 1 [88 S.Ct. 1503, 20 L.Ed.2d 381] (1976) and finds nothing inconsistent with this Court's present holding. This Court does not read *Mathis* to hold that every statement made to a paid informant as a result of a question asked while a person is incarcerated is a violation of *Miranda*. The purpose of the *Miranda* protections is to curtail coercive pressure to answer questions which could flow from a custodial interrogation of someone charged with or suspected of a crime. The Court does not find that the statements allegedly made in this case were the result of

promises, threats or coercion by the Government or any of its agents.

We agree.

In *Mathis*, the defendant was serving time in a federal prison for filing false claims against the United States government. While incarcerated, Mathis was questioned by an agent of the Internal Revenue Service (IRS) concerning another matter in which Mathis had neither been arrested nor charged. Thereafter, the IRS brought criminal charges against Mathis on the basis of his statements to the IRS agent. Relying on *Miranda*, the United States Supreme Court held that it was reversible error for the trial court to have permitted the introduction of Mathis's self-incriminating statements given without warnings as to his right to remain silent and seek the assistance of counsel.

Initially, defendant's argument that *Mathis* applies appears meritorious. Like Mathis, defendant was serving a prison term when he made his incriminating statements. Like Mathis, defendant was questioned by a government agent about a crime for which he had neither been arrested nor charged. Like Mathis, defendant was charged with and ultimately convicted of a crime based on his incriminating statements. *Mathis* has, however, been given a narrow interpretation and may be distinguished from the instant case.

The Ninth Circuit Court of Appeals has noted:

The question in this case is unique because Cervantes was residing in jail when the questioning occurred. Cervantes relies on *Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), for the proposition that any interrogation during prison confinement constitutes custodial interrogation requiring *Miranda* warnings. We do not read *Mathis* so broadly.

\*     \*     \*     \*     \*     \*

Adoption of Cervantes' contention would not only be inconsistent with *Miranda* but would torture it to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart. We cannot believe

the Supreme Court intended such a result. Thus, while *Mathis* may have narrowed the range of possible situations in which on-the-scene questioning may take place in a prison, we find in *Mathis* no express intent to eliminate such questioning entirely merely by virtue of the interviewee's prisoner status.

*Cervantes v. Walker*, 589 F.2d 424, 427 (9th Cir.1978).

■ We believe that, for *Miranda* purposes, defendant was not in custody when Sarivola questioned him. In considering whether an individual is in custody, we have stated:

Because the circumstances of each case will influence a determination of whether an individual is "in custody" for purposes of administering *Miranda* warnings, objective indicia of custody must be considered. In *State v. Kennedy*, 116 Ariz. 566, 569, 570 P.2d 508, 511 (App.1977), the court of appeals listed four factors, three of which we approve, to consider in making the determination of whether an individual is in custody. These three factors are: the site of the questioning; whether objective indicia of arrest are present; and the length and form of the interrogation. We also will consider the method used to summon the individual. *See United States v. Bautista*, 684 F.2d 1286, 1292 (9th Cir.1982).

*State v. Cruz–Mata*, 138 Ariz. 370, 373, 674 P.2d 1368, 1371 (1983). In the instant case, Anthony Sarivola did not place any restraints on the defendant, and the defendant was free to leave Sarivola's presence at any time. The objective indicia of arrest were absent. The mere fact that the defendant was incarcerated at the time the statements were made does not mandate a finding of custody. A prison inmate is not automatically in "custody" within the meaning of *Miranda*. *United States v. Cooper*, 800 F.2d 412, 414 (4th Cir.1986). "Custody" or "restriction" in the prison context " 'necessarily implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement.' " *Cooper*, 800 F.2d at 414

(citing *United States v. Conley*, 779 F.2d 970, 973 (4th Cir.1985), *cert. denied, Conley v. United States*, 479 U.S. 830, 107 S.Ct. 114, 93 L.Ed.2d 61 (1986)).

We do not believe the defendant was subject to custodial interrogation by Sarivola. *Miranda* warnings were not required. We find no error.

## 2. VOLUNTARINESS OF CONFESSION

Defendant next contends that the trial court erred in determining that his confession to Sarivola was voluntarily made. Defendant argues that the confession was the product of coercion and its use during the trial was a violation of due process under the fifth and fourteenth amendments of the United States Constitution and Art. 2, § 4 of the Arizona Constitution.

Defendant contends that because he was an alleged child murderer, he was in danger of physical harm at the hands of other inmates. Sarivola was aware that defendant faced the possibility of retribution from other inmates, and that in return for the confession with respect to the victim's murder, Sarivola would protect him. Moreover, the defendant maintains that Sarivola's promise was "extremely coercive" because the "obvious" inference from the promise was that his life would be in jeopardy if he did not confess. We agree.

■ The state must show by a preponderance of the evidence that a confession is freely and voluntarily made. *State v. Graham*, 135 Ariz. 209, 211, 660 P.2d 460, 462 (1983). A trial court's determination regarding the voluntariness of a confession however, must be viewed in a totality of the circumstances and will not be upset on appeal unless the defendant shows that the court's ruling was clear and manifest error. *Id.* at 211, 660 P.2d at 462.

In the instant case, at the hearing on the motion to suppress, defendant provided the trial court with little or no evidence tending to support defendant's claim that he was in danger and that Sarivola used this fact to coerce a confession. Thus, on the evidence before it, the trial court did not abuse its

discretion.[1]

■ Since we are mandated to search the record for fundamental error, A.R.S. § 13–4035, we note that based on defendant's argument that the confession was involuntary, the trial court instructed the jury as follows:

> You must not consider any statements made by the defendant to a law enforcement officer unless you determine beyond a reasonable doubt that the defendant made the statements voluntarily. The defendant's statement is not voluntary whenever a law enforcement officer used any sort of violence or threats or any promise of immunity or benefit.

As a result, the trial court instructed the jury on the issue of voluntariness, but failed to instruct the jury on whether Anthony Sarivola was a law enforcement officer and it is not clear whether the jury understood Sarivola to be a "law enforcement officer". We believe the trial court erred in not instructing the jury on who would be a "law enforcement officer" when considering the voluntariness of the confession made.

■ At the time defendant admitted the killing to Sarivola, Sarivola was a paid government agent working with the F.B.I. Prior to the confession, Sarivola passed rumors of the defendant's alleged murder of a child along to the F.B.I. On being informed of these rumors, the F.B.I. requested that Sarivola find out more. At the same time, the defendant had been receiving rough treatment from other inmates allegedly in view of the fact that he may have been a child murderer. In response to Sarivola's offer of protection, the defendant confessed. As we have stated:

> To be deemed free and voluntary within the meaning of the fifth amendment, a confession must not have been obtained by "any direct or implied promises, however slight, *nor by the exertion of any improper influence* " (emphasis added). *Malloy v. Hogan,* 378 U.S. 1, 7, 84 S.Ct.

1489, 1493, 12 L.Ed.2d 653 (1964) (quoting *Bram v. United States,* 168 U.S. 532, 543, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897)). These standards also apply to the states through the fourteenth amendment. *Malloy v. Hogan,* 378 U.S. at 6, 84 S.Ct. at 1492.

In Arizona, confessions are prima facie involuntary and the burden is on the state to show that the confession was freely and voluntarily given. *State v. Hensley,* 137 Ariz. 80, 87, 669 P.2d 58, 65 (1983). The burden of proof is that of a preponderance of the evidence. *Id.* While the trial court's determination that a confession was voluntary will not normally be disturbed on appeal, the record must contain evidence from which the appellate court can find that the state carried its burden of proof. *State v. Hall,* 120 Ariz. 454, 456, 586 P.2d 1266, 1268 (1978). Bearing these requirements in mind, we have examined the entire record and find that it does not contain sufficient evidence to support the trial court's findings of voluntariness. *State v. Thomas,* 148 Ariz. 225, 227, 714 P.2d 395, 397 (1986).

In rebuttal to the defendant's motion to suppress, the state alleged that at no time did the defendant indicate he was in fear of other inmates or did he seek Sarivola's "protection." Additionally, the state says that the defendant only spoke to Sarivola in conversational tones about what he had done to his step-daughter. Such a response is insufficient to create a prima facie establishment of voluntariness by a preponderance of the evidence. *Hensley,* 137 Ariz. at 87, 669 P.2d at 65, *later appeal, State v. Hensley,* 142 Ariz. 598, 691 P.2d 689 (1984). The statements should have been suppressed.

In view of that fact, however, a similar and even more explicit confession was also made to Donna, and this latter confession was admissible and not the "fruit of the poisonous tree." Hence, any error occurring in the instruction on the voluntariness

---

1. After the ruling on the motion to suppress, Sarivola testified that the defendant had been receiving "rough treatment from the guys, and if the defendant would tell the truth, he could be protected." As discussed below this promise rendered the confession involuntary.

of the Sarivola confession is harmless beyond a reasonable doubt.

The basic federal standard for harmless error states:

[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.

*Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

The court later stated:

Our judgment [on the harmlessness of the error] must be based on our own reading of the record and on what seems to us to have been the probable impact of the [challenged evidence] on the minds of an average jury.

*Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969).

The *Harrington* court concluded that the admission of certain evidence was harmless error because it was merely cumulative of other legitimately admitted evidence on the same issues and that such "overwhelming evidence" otherwise established defendant's guilt. *Id. See also United States v. Hasting*, 461 U.S. 499, 510–12, 103 S.Ct. 1974, 1981–82, 76 L.Ed.2d 96 (1983) (indicating continuing adherence to "beyond a reasonable doubt" standard).

Federal courts have approached the determination of harmless error on a case-by-case basis. When a subsequent confession is obtained constitutionally, there is a definite inclination to hold that the admission of prior "inadmissible" confessions constitutes harmless error. *See, e.g., United State v. Johnson*, 816 F.2d 918, 923 (3d Cir.1987) (admission of invalid oral confession was harmless error when subsequent written confession was admissible and more credible); *Bryant v. Vose*, 785 F.2d 364, 367 (1st Cir.), *cert. denied*, 477 U.S. 907, 106 S.Ct. 3281, 91 L.Ed.2d 570 (1986) (court admitted subsequent written confession that strongly indicated guilt); *Martin v. Wainwright*, 770 F.2d 918, 932–34 (11th Cir.1985) *cert. denied*, 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986) (improper admission of first confession was harmless error when a lawful confession was later admitted at trial); *United States v. Packer*, 730 F.2d 1151, 1157 (8th Cir.1984) (harmless error when subsequent statements reiterated earlier inadmissible statements and strongly indicated guilt).

Arizona courts follow the *Chapman* "beyond a reasonable doubt" standard. *See, e.g., State v. Montes*, 136 Ariz. 491, 497, 667 P.2d 191, 197 (1983) (subsequent statement recounted in detail the events of the crime and rendered initial statement innocuous). In *State v. Thomas*, 130 Ariz. 432, 435–36, 636 P.2d 1214, 1217–18 (1981), the court expressed the harmless error rule differently:

If, however, it appears that the error did contribute to or significantly affect the verdict, fundamental error was committed and reversal is mandated on due process grounds.

Still another Arizona formulation was given in *State v. Winegar*, 147 Ariz. 440, 450, 711 P.2d 579, 589 (1985):

An error is harmless only if no reasonable probability exists that the verdict might have been different had the error not been committed.

*See also State v. Sands*, 145 Ariz. 269, 274, 700 P.2d 1369, 1374 (App.1985) (improper admission of privileged testimony was harmless error when the evidence was "not critical" to the state's case).

Whether the standard is called "beyond a reasonable doubt," *or* "contribute to or significantly affect," *or* "no reasonable probability," *or* "not critical" *or* some other formulation, the Arizona courts seem to focus on whether there is overwhelming additional evidence sufficient to establish the prosecution's case. *See, e.g., State v. Castaneda*, 150 Ariz. 382, 387, 724 P.2d 1, 6 (1986) (admission of coerced confession harmless error). *See also State v. Hensley*, 137 Ariz. 80, 88–89, 669 P.2d 58, 66–67 (1983) (confession "merely cumulative of other, overwhelming evidence on the same point").

In the present case, the defendant's second confession established his guilt. Physical evidence from the wounds, the ligature, location of the crime scene and motor-

cycle tracks corroborated the confession. Therefore, the invalid first confession was cummulative of the admissible second confession. Moreover, due to the overwhelming evidence adduced from the second confession, if there had not been a first confession, the jury would still have had the same basic evidence to convict defendant. The admission of the first confession was, therefore, harmless error beyond a reasonable doubt.

## 3. RIGHT TO COUNSEL

■ Defendant next argues that it was improper for Sarivola to question him without the presence of counsel under the sixth and fourteenth amendments to the United States Constitution and Art. 2 § 4 of the Arizona Constitution. Although defendant admits he was not under indictment for murder at the time the confession occurred, he nonetheless claims that he was the focus of the investigation and incarcerated under this pretense in order to obtain incriminating statements. We do not agree.

The sixth amendment right to counsel does not attach during pre-indictment questioning. *State v. Ortiz*, 131 Ariz. 195, 201, 639 P.2d 1020, 1026 (1981), *cert. denied, Ortiz v. Arizona*, 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982). At the time of the confession, the defendant was serving a term on an unrelated charge and had not yet been indicted for murder. Moreover, based on a review of the record, there is neither evidence nor any allegations that at the time of the confession, either Sarivola or his FBI contact were aware of any official investigation in Arizona. Under these facts, no adversary proceeding had begun when defendant was questioned by Sarivola. Defendant's sixth amendment right to counsel was not violated.

## 4. FRUIT OF THE POISONOUS TREE

■ Defendant next argues that his confession to Donna should have been suppressed as the result of Sarivola's violation of defendant's fifth and sixth amendment rights approximately six months earlier, based on the "fruit of the poisonous tree" doctrine. *See Wong Sun v. United States,*

371 U.S. 471, 484–86, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963). Moreover, the defendant maintains that this original confession "let the cat out of the bag" and thus the voluntariness of his confession to Donna was not sufficient to "purge the taint" of the illegally-obtained evidence. *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975).

Assuming, as we have, that the confession to Sarivola was the result of a violation of defendant's fifth amendment rights, the later confession to Donna might be inadmissible. *Brown v. Illinois*, 422 U.S. at 603–04, 95 S.Ct. at 2261. However, if the taint of the illegal conduct was sufficiently attenuated, that statement may be admitted as an otherwise voluntary confession, considering the time since the original statement and the presence of intervening circumstances. *Rawlings v. Kentucky*, 448 U.S. 98, 107–10, 100 S.Ct. 2556, 2562–64, 65 L.Ed.2d 633 (1980).

In the present case, some six months had elapsed between the original confession to Sarivola and the confession to Donna. Moreover, the defendant made his confession to Donna after his release from prison, presumably at a time when he no longer needed Sarivola's protection. Lastly, the defendant made the confession in the course of a casual conversation with Donna, who was not an agent of the state.

When viewed in this context, any "taint" from the earlier confession was sufficiently attenuated to permit the admission of Donna's testimony. Any argument based on "the fruit of the poisonous tree" doctrine is, therefore, inapplicable.

## 5. PHOTOGRAPHIC EVIDENCE

■ Defendant next contends that the trial court erred in admitting a "gruesome and repulsive" photograph showing a ligature around the victim's neck. Before admission into evidence, the photograph was "blacked-out" to show only portions of the neck and shoulders. The photograph did not show the face or the arms.

We have previously stated that relevant evidence may be admitted despite its tendency to inflame the passions of the jurors if

its probative value outweighs the danger of unfair prejudice. Ariz.R.Evid. 401, 403; *State v. Bracy,* 145 Ariz. 520, 533, 703 P.2d 464, 477 (1985), *cert. denied, Bracy v. Arizona,* 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986); *State v. Chapple,* 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983).

We believe the photo was relevant to a fact in issue. The defendant at trial asserted, by way of questioning, that the victim was not choked before being shot. The photograph shows the ligature positioned on the victim's neck. The photograph is relevant to the contested issue of whether the victim was choked. Accordingly, the photograph is probative of this issue and properly admitted by the trial court. *State v. Hallman,* 137 Ariz. 31, 34, 668 P.2d 874, 877 (1983).

Additionally, we find the blacked-out photograph was neither particularly gruesome, repulsive nor inflammatory. We find no error.

### 6. CHARACTER EVIDENCE

Defendant challenges a number of instances where evidence of character and prior bad acts were erroneously admitted.

#### a. *The "spanking" incident*

At trial, the victim's mother and former wife of the defendant testified that on one occasion, the defendant had spanked the victim with a spanking board, leaving bruises on her buttocks. The incident was reported to the police by school officials, who later called on the defendant to investigate the matter. Subsequently, defendant told the victim he would "get even" with her, and that he would "kill her fucking ass." Defendant argues that this evidence was improperly admitted under Arizona Rules of Evidence, 404(a)(1) because

defendant's character had not been put in issue. We do not agree.

Admittedly, Rule 404(a)(1) precludes the state from introducing character evidence to show that defendant acted in conformity with such character unless the character evidence is first offered by the accused.

We need not, however, determine whether the evidence was admissible under this rule. We believe that the evidence of the defendant's troubled relationship with the victim was admissible on the issue of motive pursuant to Rule 404(b), which reads:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Rule 404(b) Arizona Rules of Evidence.

This evidence of prior trouble between the victim and the defendant derives its relevance from the fact that the existence of prior ill will toward the victim not only renders the commission of the crime more probable, but also tends to show the malice or motive of the defendant in perpetrating the crime. Evidence of this prior bad act, taken together with defendant's expressions to get even with the victim, show a continuing state of mind from which a jury could properly infer that the defendant had a motive to kill the victim. *State v. Jeffers,* 135 Ariz. 404, 418, 661 P.2d 1105, 1119 (1983), *cert. denied, Jeffers v. Arizona,* 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1985), reversed on other grounds, *Jeffers v. Ricketts,* 832 F.2d 476, 480–481 (9th Cir. 1987).[2] We believe the evidence was properly admitted.

---

**2.** The holding in *Jeffers v. Ricketts* on remand for resentencing may appear to overrule *Woratzeck v. Ricketts,* 820 F.2d 1450 (9th Cir.1987). *Woratzeck,* held that the factual findings of the Arizona Court in imposing the death sentence is entitled to deference pursuant to 28 U.S.C. § 2254(d). As a result, a motion for rehearing is pending in the Ninth Circuit to reconcile these decisions and to question the ability of the court of appeals to independently give a narrow-

ing construction to the aggravating factors for upholding the death sentence. In a similar situation, the United States Supreme Court recently granted review of this issue decided in *Cartwright v. Maynard,* 822 F.2d 1477 (10th Cir. 1987), in which the federal court of appeals interpreted the aggravating factors in Oklahoma's death sentencing scheme, *cert. granted, Maynard v. Cartwright,* 484 U.S. 1003, 108 S.Ct. 693, 98 L.Ed.2d 645 (1988).

### b. *Defendant's association with Anthony Sarivola*

▮ Defendant next asserts reversible error in allowing evidence to be admitted of defendant's association with Anthony Sarivola. The defendant argues that such evidence is prejudicial because of Sarivola's connection with organized crime in New York. The state maintains that such evidence was necessary to establish why Sarivola was in prison and the circumstances under which defendant came to make his confession. We agree with the State.

Initially, we note that evidence of Sarivola's organized crime connections was relevant evidence admissible under Rule 401 to show why defendant may have confessed to Sarivola to seek protection from the rest of the inmate population. Moreover, Sarivola's crime connection was relevant to show why defendant would confess to someone of Sarivola's ilk in seeking protection.

Although Sarivola's organized crime connections may be relevant, they may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403, Ariz.R.Evid., *State v. Hensley*, 142 Ariz. 598, 602, 691 P.2d 689, 693 (1984). In determining the relevancy and admissibility of evidence, the trial judge is invested with considerable discretion. *Id.* at 602, 691 P.2d at 693. Such discretion will not be disturbed on appeal unless clearly abused. *Id.* In the instant case, the defendant has failed to show how evidence of Sarivola's organized crime connections would cause prejudice to defendant. That Sarivola was involved with organized crime reflected on Sarivola's character, not the defendant's character. In so far as Sarivola testified as to defendant's confession, Sarivola's organized crime connection could serve to impeach Sarivola and may have, in fact, been beneficial to defendant rather than prejudicial. We believe the probative value of this evidence outweighs any prejudicial effect. Rule 403, Ariz.R.Evid. 17A A.R.S.

We find no error.

### c. *Prior felony convictions*

▮ Defendant next contends he was prejudiced by the admission of evidence regarding his 1971 felony conviction for issuing bad checks, and his 1983 felony conviction for being a felon in possession of a firearm. The state points out however, that the defendant did not object to the introduction of the prior convictions at trial and, therefore, waived any right to assert that the trial court erred on appeal. *State v. Thomas*, 130 Ariz. 432, 435, 636 P.2d 1214, 1217 (1981).

During the pre-trial proceeding, it became obvious that evidence of defendant's jail time would be admitted. This would be true of defendant's confession to Sarivola as well as the complete story of defendant's confession to Donna Misch (Sarivola.) Thus, at least one of defendant's prior convictions would become known to the jury. Knowing this, the trial court in its voir dire of the jury asked:

> There will be in this case evidence that Mr. Fulminante has been convicted of other crimes in the past. I'll give you further instructions as to the legal effects of that kind of evidence and how you should consider that evidence.

> Would the fact, however, just knowing that Mr. Fulminante has had prior convictions in the past, have any effect on your ability to render a fair and impartial verdict in this matter?

> \*    \*    \*    \*    \*    \*

Later, the following occurred outside the presence of the jury.

> The Court: The next matter was a Motion in Limine filed by the State dated November 25, relating to a request that the court enter an order allowing State to inquire of its witnesses, and that the Defendant, should he take the stand, and of his witnesses, if any, concerning the fact that the Defendant was incarcerated in Raybrook Federal Prison in New York State. Is there any argument on this motion?

> Mr. Scull (prosecuting attorney): Judge, I don't think so. Most of that is moot now as I understand it because there has been an admission in the ques-

tioning to the jury about the fact that the Defendant was incarcerated, so I would assume then that I would be able to go into this at trial, to a limited extent to at least show the surroundings concerning the confessions.

The Court: It's really the opposite of a motion in limine. It's a motion to—anticipating a possible objection, I suppose; is that right?

Mr. Scull: Well, yes. I think, because as the Court is aware, any time you mention that a Defendant has been in prison on other charges, you have got an almost instant mistrial. So to avoid that situation, I want to bring it up ahead of time.

The Court: All right. Do you wish to be heard on that, Mr. Koopman?

Mr. Koopman (defendant's attorney): Yes, Your Honor. Your Honor, I have already indicated to Mr. Scull that it would be ludicrous of us not to bring into the fact or bring in or allow in a direct case presented by Mr. Scull, the fact that my client was incarcerated in Ray Brook Prison. Otherwise, there could be no explanation for the conversation between him and Mr. Sarivola and it would certainly hamper my attempts to attack Mr. Sarivola's credibility.

The problem that arises with this, Your Honor, is that I do not want the jury left unknowledgeable as to what the specific charge was and if the fact was he was doing time for illegal possession, as a felon, of a firearm, which was the .357 magnum, I understand, which he owned here in Arizona.

Well, if we tell the jury that he was doing time in Ray Brook for possession, as a felon in possession of a firearm, they are going to be trying to guess at what the underlying felony was.

I, therefore, have indicated to Mr. Scull that I'll stipulate and agree that he may bring into evidence the fact that my client was convicted in 1971 of the crime of uttering a check by false endorsement, which in fact he was found guilty of.

\* \* \* \* \* \*

I suggest to you, Your Honor, that this has been Mr. Scull's attempt to lay an undercurrent of sexual misconduct before the jury pertaining to my client. There's no evidence in his case at all of any sexual misconduct by my client and therefore, Your Honor, I would request that the Court order at this point in time that neither on the direct case as put on by Mr. Scull from his witnesses, nor, if my client takes the stand, in his cross-examination of my client as to his prior convictions should that 21 year old conviction be allowed into evidence.

The Court: Well, okay. Just for purposes of clarification, his first request was to allow evidence to come in of the fact that your client was imprisoned in New York, what he was imprisoned in New York for, and the underlying felony for which that crime he was in prison for related.

Mr. Koopman: And I'm saying as long as it just goes back to the 1971 conviction for the uttering a false check, which was a felony, and not back to the 1964 conviction for carnal abuse of a child.

Defendant's attorney realized that some evidence of defendant's prior convictions would come into evidence. Indeed, the trial court had already mentioned a prior conviction in his remarks to the jury. The defendant's attorney agreed that the conviction for uttering false checks and felon in possession of a firearm could be heard and at the same time was successful in keeping the more prejudicial conviction of carnal knowledge of a child from the jury. Since the convictions for uttering false checks and felon in possession of a firearm were introduced for the purpose of legitimate trial strategy by defendant's attorney, he seemingly struck a good bargain in allowing the conviction to come in while keeping evidence of the conviction for carnal knowledge out. We find no error.

### d. *Relationship with Wife*

Defendant next contends that the admission of statements made by a police detective in the jury's presence concerning defendant's deteriorating relationship with

his wife prior to the murder was improper. The following took place before the jury:

Q. [By Mr. Scull]: Did you ever discuss with Mr. Fulminante on the 16th or 17th his relationship with his stepdaughter, Jeneane?

A. [By Mark Jones]: Yes.

Q. What was his response?

A. He felt that his relationship with his daughter was good. In fact, he made the comment that because Mary worked, and he didn't, that Jeneane would come to him with her problems.

Q. All right. Did he indicate or did you ever ask him how his relationship was with Mary?

Mr. Koopman: Objection, irrelevant.

The Court: Sustained.

Well, wait a minute, let me—

Mr. Scull: There's going to be a tie in, Judge.

The Court: I'll let you—on what basis are you asking that that be—why are you objecting to that?

Mr. Koopman: Your Honor, I don't see what my client saying his relationship with his wife is has to do with the death of this little girl. I also—I also think that it might go—we might be [infringing] on the spousal relationship, Your Honor, and the privilege attached thereto, which may come into issue at sometime in this case.

The Court: Let me hear you.

Mr. Scull: I'm asking what Mr. Fulminante said about his relationship with Mary. One of the things that the State expects to prove is that the relationship between Oreste Fulminante and Mary was not good. It was deteriorating rapidly and that's one of the reasons that we believe he committed this homicide, was to get rid of this girl so that he could re-establish his relationship with his wife.

The Court: Let me see counsel at the bench for a moment, please.

(Whereupon, a discussion was held at the bench between the Court and both counsel, out of the hearing of the jury and the Court Reporter.)

The Court: The objection is sustained.

■ Defendant first argues that the prosecutor's argument was clearly improper, and that it should have been stricken. Defendant is, however, precluded from arguing for the first time on appeal that the prosecutor's comments should have been stricken where he failed to request the trial court to do so. *State v. Thomas*, 130 Ariz. 432, 435, 636 P.2d 1214, 1217 (1981).

■ Defendant further argues that it was prejudicial for the jury to hear the argument on the objection to the question. Again, defendant did not request to have the matter heard outside the jurors' presence. In any event, defendant suffered no prejudice because of the prosecutor's comments. The state subsequently presented direct and more damaging testimony from defendant's wife that defendant's relationship with her was troubled. We find no error.

e. *Evidence that other persons suspected defendant had committed the crime*

Defendant next contends the trial court erred in admitting testimony from a police detective that others felt defendant had committed the crime. This matter is raised as a separate grounds for error in item 9 of the Trial Issues. We will consider the question under that heading.

f. *Evidence of victim's dislike of defendant*

The victim's mother testified as follows:

Q. [By Mr. Scull] Was there a time when she spent the night over at a friend's house and that was without prior approval from you?

A. [By Mary Elizabeth Hunt] Yes.

Q. Okay. On that occasion, were you advised of that, that she was doing that?

A. I had found out where she was. I did not know that she was planning to do that without my knowledge, no, but I did find out where she was.

Q. All right. What did you do about it?

A. Well, I made an arrangement with the mother of the little girl whose

house where she went to stay would take care of her for that weekend until I had a chance to collect my thoughts and decide what we should do about it.

Q. All right. What did you do about it?

A. Well, we decided that, you know, she came home over the weekend, and I decided to talk to her, and to ask her, you know; she told me why she did what she done and it was because she didn't want to stay in the house with Oreste any more and she really didn't want to come back home if he was going to stay.

Q. Is that the only occasion like that?

A. Jeneane has never, ever, ever left that house. That was the first time.

■ Defendant argues that evidence of the victim's dislike and desire not to continue living in the same household with defendant was improperly admitted. The defendant further maintains the evidence was victim's opinion as to the defendant's character, and thus is prejudicial and irrelevant. We disagree.

We believe that under the circumstances in which the statements were made, the statements lie within an exception to the hearsay rule. Pursuant to Rule 803(3), Ariz.R.Evid., the then existing state of mind of the victim may be admissible to show the victim's dislike of the defendant.

A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, indentification, or terms of declarant's will.

Ariz.R.Evid. 803(3) 17A A.R.S.

The victim's desire in this case was not being offered to prove anything remembered or believed. It fits within the state of mind exception, and it was relevant. Rule 401 provides:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more proba-

ble or less probable than it would be without the evidence.

As we have stated:

Evidence is relevant if it has any basis in reason to prove a material fact in issue or if it tends to cast light on the crime charged.

*State v. Moss,* 119 Ariz. 4, 5, 579 P.2d 42, 43 (1978).

■ The wish of the victim not to live in the same house with the defendant was relevant in this case because it was used to show that the victim and defendant did not get along and ill feelings existed between the parties. Establishing that the victim disliked the defendant and hence that the family situation was not harmonious, were factors in disputing defendant's claims that he had no reason or motive to murder the victim. Additionally, since the defendant claimed that the victim and he got along well, and no feelings of ill will between the parties existed, the statements of the victim's mother are relevant to dispute this contention. *See People v. Arcega,* 32 Cal.3d 504, 527, 186 Cal.Rptr. 94, 107, 651 P.2d 338, 350 (1982).

This kind of statement is unlike the one recently held inadmissible and irrelevant by this court. *State v. Charo,* 156 Ariz. 561, 564, 754 P.2d 288, 291 (1988). In that case, this court held that the victim's *fear* is irrelevant to prove the defendant's conduct. *Id.* at 565, 754 P.2d at 292. Conversely, in this case, the evidence of the victim's *dislike,* as opposed to fear, of the defendant is not being used to show the defendant's *conduct;* rather it is being used as evidence of the defendant's *motive* for killing the victim.

We believe the evidence was admissible and relevant for the purpose of establishing the troubled relationship between the defendant and the victim and that the probative value of the disputed evidence was not outweighed by the danger of unfair prejudice. *Jeffers,* 135 Ariz. at 417, 661 P.2d at 1128. We find no error.

g. *Defendant's reputation for truthfulness*

During direct examination, Sarivola testified as follows:

Q. [By Mr. Scull]: Now, what kind of reputation, if you know, did Mr. Fulminante have around the prison for being truthful and honest?

A. [By Mr. Sarivola]: Well, most people believe him not to be truthful.

Defendant argues this evidence was not presented for the purpose of impeachment, because the defendant did not testify, but rather presented to show the defendant was of bad character, in violation of Rule 404(a), Arizona Rules of Evidence. Defendant also contends the admission of the evidence violated Rule 608(a), Arizona Rules of Evidence.

We need not consider this allegation. Defendant made no objection and may not raise the question on appeal. We have previously held:

It is well established that failure to object to evidence, testimony or arguments waives these matters on appeal. *See, e.g. State v. Wilson,* 113 Ariz. 308, 553 P.2d 235 (1976). Additionally, a party must state distinctly the matter to which he objects and the grounds of his objections. *State v. Baca,* 102 Ariz. 83, 425 P.2d 108 (1967): 17A A.R.S. Rules of Evidence, Rule 103(a)(1). By failing to make a timely, specific objection to the prosecutor's remarks or the victim's testimony, appellant has waived these issues on appeal absent a finding of fundamental error.

*State v. Thomas,* 130 Ariz. 432, 435, 636 P.2d 1214, 1217 (1981). *See also, State v. Smith,* 136 Ariz. 273, 277, 665 P.2d 995, 999 (1983), *appeal after remand,* 141 Ariz. 510, 687 P.2d 1265 (1984).

The error, if such, was waived.

## 7. EVIDENCE THAT A THIRD PARTY COMMITTED THE MURDER

■ Defendant claims the trial court erred in precluding relevant evidence bearing on reasonable doubt as to the defendant's guilt. Defendant's offer of proof showed that a neighbor of the victim and the defendant drove a motorcycle, owned a .357 magnum handgun, had attempted to kill a police officer on one occasion, and was suspected of committing crimes against children. Defendant failed, however, to offer any evidence that connected the neighbor to the crime in this case. The court denied the defendant's request to introduce this evidence.

Before a defendant may introduce evidence that another person may have committed the crime, the defendant must show that the evidence has an inherent tendency to connect such other person with the actual commission of the crime. Vague grounds of suspicion are not sufficient. *State v. Williams,* 133 Ariz. 220, 231, 650 P.2d 1202, 1213 (1982).

The evidence offered by the defendant, although establishing that the third party may have had the ability to commit the crime, failed to connect him to the murder. The trial court's discretion in this matter will not be disturbed unless it has been clearly abused. *Id.* at 230, 650 P.2d at 1212. We find no abuse of discretion by the trial court.

## 8. EVIDENCE OF ANTHONY SARIVOLA'S CHARACTER

Prior to trial, the trial court ruled that the defendant would be allowed to impeach Anthony Sarivola with a specific instance in which he had lied to an FBI agent. As a matter of trial strategy, the prosecutor disclosed the incident during his direct examination of the FBI agent. The prosecutor then asked the agent his opinion as to Sarivola's credibility. Defendant unsuccessfully objected.

On review, defendant asserts the admission of the testimony violated the Arizona Rules of Evidence which state:

The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

Ariz.R.Evid. 608(a)

■ We do not agree. Under Rule 608(a), a witness may testify as to his opin-

ion of another party's truthfulness if the party's truthful character has been attacked. *United States v. Hilton,* 772 F.2d 783, 786 (11th Cir.1985). In the instant case, the trial court had ruled that Sarivola's truthful character could be attacked by defendant. It was not error for the state to "draw the sting" by not only introducing on direct examination the evidence of instances in which Sarivola had lied to the FBI agent, but of the agent's opinion of Sarivola's character. We find no error.

### 9. ADMISSION OF OPINION OF GUILT

During the cross-examination of the investigating detective, defense counsel inquired as to why he thought the defendant had committed the murder and the basis of his opinion. The defense counsel first read from a treatise on the Fundamentals of Criminal Investigation.

Q. [By Mr. Koopman]: "The best hypotheses must be objectively tested and modified or rejected when contrary evidence is uncovered. The investigator must not permit his observations and interpretations to be biased in favor of the hypotheses."

Would you like to read?

A. [By Mark Jones]: No, sir.

Q. Okay. Do your understand what Mr. O'Hara is saying in that statement?

A. Yes, sir, I do.

Q. Do your agree with that statement?

A. Yes, I do.

Q. And in fact, would it be fair to say that that type of criminal investigation technique warning warns you not to allow a bias toward a suspect interfere with your investigation?

Haven't you learned that, also, in other courses, in other investigative courses throughout your career?

A. Yes, sir.

Q. But on September the 16th, just shortly after the body of little Jeneane Hunt was found, you put it in your mind that this man was the killer of that little girl; correct?

A. Yes, sir, I knew he was.

Q. You knew he was?

A. Yes, sir.

Q. You knew he was from what physical evidence that you had at that point in time, Officer?

A. From the inconsistent statements at that time.

Q. From the inconsistent statements wherein he said if I can recall, "I drove toward Apache Junction," when in fact he told Officer Riggs he drove toward Phoenix, correct?

A. That's only one.

Q. That's one. Another one is, he told Riggs he would talk to neighbors in the morning, but you found out he didn't talk to neighbors until the afternoon; correct?

A. He did not talk to neighbors. He talked to a neighbor.

Q. Talked to a neighbor. And for those two inconsistencies, you considered this man a murderer of his stepchild, and therefore, set out to prove him guilty; is that correct?

A. No, sir. There's much more to it than that.

Q. Well, you didn't have much more on September the 16th. At that point in time, the autopsy hadn't been done?

A. I knew that he had purchased an extra barrel for his weapon.

Q. Okay.

A. I knew that he was telling us that he had sold a gun to buy milk and bread, and in fact, on the 17th, we found out that he used that gun to trade for an extra barrel for that weapon.

Q. And $20, correct?

A. Yes, sir, he did receive $20.

■ On redirect examination, the detective was asked if he had any other evidence on which he based his opinion. Defense counsel objected, but the objection was overruled. The trial court ruled that counsel had "opened the door" regarding the reasons the detective suspected the defendant, and the information relied on in forming that opinion. Defendant now contends that it was improper and prejudicial for the detective to testify as to his opinion or suspicion of guilt of the defendant, or in

the alternative the testimony was hearsay. We do not agree.

On rebuttal the state may offer any competent evidence that directly replies to or contradicts any material evidence introduced by the accused. Moreover, as we have noted:

Generally, where the defendant, by putting on testimony opens the door to proper rebuttal, he cannot complain if rebuttal testimony, offered by the State, also tends to prove or reinforce the State's case in chief * * *.

*State v. Kountz*, 108 Ariz. 459, 463, 501 P.2d 931, 935 (1972), (quoting *State v. Dowthard*, 3 Ariz.App. 237, 239, 413 P.2d 296, 298 (1966)). We find no error.

### B. Death Penalty Issues

### 1. ARE THE TERMS "CRUEL, HEINOUS, OR DEPRAVED" VOID FOR VAGUENESS?

▮▮▮ Defendant contends that the terms "especially heinous, cruel or depraved," are unconstitutionally vague. This court has previously stated that the terms "cruel, heinous, or depraved," are not void for vagueness.

We have objectively defined the relevant terms: a murder is "heinous" if "hatefully or shockingly evil;" "cruel" if "disposed to inflict pain especially in a wanton, insensate or vindictive manner: sadistic;" and "depraved" if "marked by debasement, corruption, perversion or deterioration." *State v. Knapp*, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). Cruelty focuses on the sensations of the victim before death, depravity focuses on the murderer's state of mind, and heinousness focuses on society's view of the murder as compared to other murders. To use this aggravating circumstance, the trial court must find that the murder is *especially* heinous, cruel, or depraved. *State v. Lujan*, 124 Ariz. 365, 604 P.2d 629 (1979). We believe these standards satisfy *Godfrey* [*v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) ] and that the especially cruel, heinous, and depraved

aggravating circumstance has not been defined in an unconstitutionally broad and vague manner.

*State v. Ortiz*, 131 Ariz. 195, 206, 639 P.2d 1020, 1031 (1981), *cert. denied, Ortiz v. State*, 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982). We find no error.

### 2. WAS THE DEATH PENALTY PROPERLY IMPOSED?

We have the duty to independently review the existence of aggravating or mitigating circumstances and to determine whether the death penalty was improperly imposed or should be reduced to life imprisonment. *State v. Roscoe*, 145 Ariz. 212, 226, 700 P.2d 1312, 1326 (1984), *cert. denied, Roscoe v. Arizona*, 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 525 (1985); *State v. Richmond*, 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976), *cert. denied, Richmond v. State*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977).

Defendant was found guilty of one count of first degree murder. The trial court by special verdict, A.R.S. § 13–703(D), found as an aggravating circumstance that the murder was committed in an especially cruel, heinous, or depraved manner. Finding no mitigating circumstances sufficiently substantial to outweigh this aggravating circumstance, the trial judge sentenced the defendant to death.

Defendant contends that the trial court improperly imposed the death penalty by finding as an aggravating factor the murder was especially cruel, heinous, or depraved. A.R.S. § 13–703(F)(6) establishes as an aggravating circumstance the fact *that a defendant commits a murder in an especially cruel, heinous, or depraved manner.* These terms are considered disjunctive; the presence of any one of the three factors is an aggravating circumstance. *State v. Correll*, 148 Ariz. 468, 480, 715 P.2d 721, 733 (1986).

### a. Cruelty

▮▮▮ Cruelty is manifested by a murder "disposed to inflict pain especially in a wanton, insensate, or vindictive manner: sadistic." *State v. Knapp*, 114 Ariz. 531, 543,

562 P.2d 704, 716 (1977), *cert. denied, Knapp v. Arizona*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). Cruelty involves the pain and suffering of the victim, including any mental distress suffered prior to death. *State v. Castaneda*, 150 Ariz. 382, 393, 724 P.2d 1, 12 (1986); *State v. Bracy*, 145 Ariz. 520, 537, 703 P.2d 464, 481 (1985), *cert. denied, Bracy v. Arizona*, 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986). Thus, to suffer pain or distress, the victim must be conscious at the time the offense is committed. If the evidence is inconclusive on consciousness, the factor of cruelty cannot exist. *State v. Gillies*, 135 Ariz. 500, 513, 662 P.2d 1007, 1020 (1983), *cert. denied, Gillies v. Arizona*, 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985).

As to cruelty the trial court noted:

The court finds from the evidence, and the reasonable inferences to be drawn from the evidence, that the crime was especially cruel and that Jeneane Hunt suffered pain and mental and physical distress at the time of the crime.

The Defendant told Anthony Sarivola, a witness who testified at the trial, that prior to killing his stepdaughter he "choked her and made her beg a little bit."

The Defendant told Donna Sarivola, also a witness who testified at the trial, that he "choked her until every last breath—and then shot her." He also told Donna Sarivola that he "made her beg," "beat her", and "tortured her."

The court finds the witnesses were credible and that the Defendant did, in fact, make such statements.

The court finds independent corroboration with respect to *part* of the statements by the Defendant.

The trial evidence, including photographs, show that the ligature had been tied loosely around Jeneane Hunt's neck and was on the body when it was found. The child's mother testified the ligature appeared similar to cloth from a worn out towel.

Additional evidence of cruelty exists in the trial record. The Defendant made a statement to the child's mother of his "theory" that the child "was kneeling on the ground on her knees and she must have known it was coming. She was then shot on one side of the head and then the other."

There were additional statements made by the Defendant to the Sarivolas wherein he stated that he made the child commit an act of oral sex on him and that he raped her.

The court finds such statements were, in fact, made by the Defendant, however, there is no independent corroboration of the statements relating to sexual misconduct from any of the findings of the medical examiner or the physical evidence produced at trial.

The court finds that the possibility of sexual misconduct exists but the evidence is inconclusive and not beyond a reasonable doubt.

The statements attributed to the Defendant regarding acts of sexual misconduct are not, therefore, being considered on the issue of cruelty. Such statements are, however, being considered on the issue of whether the crime was committed with a heinous and depraved state of mind. (Emphasis in original)

■ Based on a review of the record, we find the presence of cruelty is supported by the evidence presented at trial. The fear that apparently was felt by the victim, the fact that she could anticipate that she would be murdered after being abused by her stepfather shows that this killing was wanton and sadistic, and supports a finding of cruelty.

b. *Heinous and Depraved*

■ A murder is especially heinous if it is "hatefully or shockingly evil." *Knapp*, 114 Ariz. at 543, 562 P.2d at 716. A murder is depraved if "marked by debasement, corruption, perversion or deterioration." *Knapp*, 114 Ariz. at 543, 562 P.2d at 716. The terms "heinous" and "depraved" focus upon a defendant's state of mind at the time of the offense, as reflected by his words and acts. *State v. Summerlin*, 138 Ariz. 426, 436, 675 P.2d 686, 696 (1983).

This court has set forth five factors to consider in the determination of the existence of heinous or depraved conduct:

1. relishing of the murder by the defendant;
2. the infliction of gratuitous violence on the victim beyond that necessary to kill;
3. mutilation of the victim's body;
4. the senselessness of the crime; and
5. helplessness of the victim.

*State v. Gretzler*, 135 Ariz. 42, 52–53, 659 P.2d 1, 11–12, *cert. denied, Gretzler v. Arizona*, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

This court has also stated that in the rape and murder of a young girl:

Abduction, violent sexual penetration and strangulation of a helpless seven year old child are circumstances that lead to only one conclusion. The senseless killing and the entire nature of the attack are repugnant to civilized society. The elements of a heinous crime and a depraved state of mind are present.

*State v. Roscoe*, 145 Ariz. 212, 226, 700 P.2d 1312, 1326, *cert. denied, Roscoe v. Arizona*, 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 525 (1985).

Similarly, in the killing of an elderly woman we stated:

The victim in this case was 78 years old. She had limited mental capabilities and was easily manipulated. She was helpless at the hands of appellant. He could have accomplished whatever criminal goals he desired without killing her.... We find that by sexually assaulting Winifred Duggan and senselessly killing her, knowing full well that by virtue of her advanced age and limited mental capabilities she was easy prey, appellant demonstrated a shockingly evil and corrupt state of mind.

*State v. Zaragoza*, 135 Ariz. 63, 69–70, 659 P.2d 22, 28–29, *cert. denied, Zaragoza v. Arizona*, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1356 (1983).

We believe the record supports the findings of heinous or depraved conduct in the case before us. Defendant senselessly killed a helpless victim, and as reprehensible as this may be, also violated the special parental relationship.

As the trial court noted:

The court finds from the evidence and the reasonable inferences to be drawn from the evidence that the Defendant acted with an especially heinous and depraved state of mind.

The statements made to Anthony Sarivola and to Donna Sarivola reveal the Defendants state of mind.

The Defendant told Anthony Sarivola that he "hated" Jeneane and he referred to her as a "little fucking bitch."

The Defendant told Donna Sarivola that, "I want to go piss on her grave."

The other statements made by the Defendant to the Sarivolas relating to oral sex, rape, torture, beating, making her beg, choking her until every last breath—whether they all occurred or not—show a state of mind that is shockingly evil and marked by debasement. These were statements of a man who was bragging and relishing the crime he committed.

\* \* \* \* \* \*

In considering the senselessness of the crime and the helplessness of the victim the Court has considered the special relationship of sacred parental trust which was violated. The victim was the stepdaughter of the Defendant. She was only eleven years old. Found after three days in the desert she weighed less than ninety pounds. She was a child under parental control and capable of manipulation by the Defendant. He took her to an isolated desert area where she could not be heard, would have less chance of escape, and would be subject to his complete control. She posed no threat to the Defendant at any time. She was helpless. She was easy prey. He could have accomplished any of his goals without killing her.

We find that the statutory aggravating circumstances are present to uphold the propriety of the death sentence.

### 3. VOIR DIRE EXAMINATION OF THE TRIAL JUDGE

In the instant case, defendant argues that the Arizona death penalty statute, A.R.S. § 13–703, violates the constitutional right to due process because it fails to provide for the voir dire of the trial judge for possible bias or prejudice so that a defendant can intelligently exercise his peremptory challenge for cause.

Several general propositions of law run contrary to the defendant's claim. At the outset, a judge is presumed to be fair. *State v. Perkins*, 141 Ariz. 278, 286, 686 P.2d 1248, 1256 (1984). Secondly, as this court has stated in a case where an accused claimed it was his fundamental right to approve the judge:

> While defendant in a criminal case may be entitled, as a constitutional right, to an impartial (and independent) judge, he is not entitled, as a matter of right, to any particular judge, or a constitutional right to a change of judge. (citations omitted).

*State v. Reid*, 114 Ariz. 16, 21, 559 P.2d 136, 141 (1976), *cert. denied, Reid v. Arizona*, 431 U.S. 921, 97 S.Ct. 2191, 53 L.Ed.2d 234 (1977).

This court's definition of bias and prejudice further enunciates the standard applied to judicial disqualification:

> Bias and prejudice means a hostile feeling or spirit of ill-will, or undue friendship or favoritism, towards one of the litigants. The fact that a judge may have an opinion as to the merits of the cause or a strong feeling about the type of litigation involved, does not make the judge biased or prejudiced.

*State v. Myers*, 117 Ariz. 79, 86, 570 P.2d 1252, 1259 (1977), *cert. denied, Myers v. Arizona*, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978).

Defendant's claim is not the same as the right to voir dire a jury. A judge is not the unknown quantity a prospective juror may be. Furthermore, the right to a fair and impartial tribunal is adequately protected by Arizona Rules of Criminal Procedure 10.1 and 10.2, which allow for a change of judge.

Finally, the fact that there is mandatory appeal in death sentence cases insures that this court will independently review the findings to determine if they are supported by the record, and not based on bias and prejudice. *State v. Jeffers*, 135 Ariz. at 428, 661 P.2d at 1129. Defendant has no constitutional right to conduct a voir dire examination of the trial judge.

### 4. IS ARIZONA'S DEATH PENALTY UNCONSTITUTIONAL BECAUSE IT REQUIRES IMPOSITION OF THE DEATH PENALTY WHEN ONE AGGRAVATING CIRCUMSTANCE EXISTS AND THERE ARE NO MITIGATING FACTORS?

In Arizona, under A.R.S. § 13–703(E), the trial court *must* impose a sentence of death if it finds the existence of one statutory aggravating factor and does not find the existence of any mitigating factor sufficient to call for leniency.

> Under § 13–703(E) if a case involves one or more of seven enumerated aggravating circumstances and no mitigating circumstances sufficiently substantial to call for leniency then the trial court is required to impose a sentence of death.

*State v. Zaragoza*, 135 Ariz. 63, 69, 659 P.2d 22, 28, *cert. denied, Zaragoza v. Arizona*, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1356 (1983).

Defendant contends that the statute is unconstitutional because if the court finds an aggravating circumstance and no mitigating circumstance, then the court must impose the death penalty. We do not agree. As we have noted in *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988), the statute reduces the human element in the imposition of the death penalty and in doing so saves the constitutionality of the statute. Under the statute a defendant will stand the same chance of receiving the death penalty from a judge who does not philosophically believe in the death penalty as from a judge who does. *Id.* at 247, 762 P.2d at 534. By applying the death penalty only to those who come under the statute, the death penalty is reserved only for crimes and those criminals the legislature intended to be covered by the statute. We find no error.

**5. IS ARIZONA'S DEATH PENALTY STATUTE UNCONSTITUTIONAL BECAUSE INADEQUATE STANDARDS ARE UTILIZED BY TRIAL COURTS IN BALANCING AGGRAVATING CIRCUMSTANCES AGAINST MITIGATING CIRCUMSTANCES?**

Defendant contends that in Arizona, the death penalty is imposed wantonly, aribitrarily and freakishly because no ascertainable standards are provided for the sentencing authority to measure the relative weights to be given the aggravating and mitigating factors which have been found to exist. This contention has been rejected numerous times by this court. *See generally, State v. Gretzler*, 135 Ariz. 42, 53–54, 659 P.2d 1, 12–13, *cert. denied, Gretzler v. Arizona*, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983); *State v. Greenawalt*, 128 Ariz. 150, 175, 624 P.2d 828, 853, *cert. denied, Greenawalt v. Arizona*, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981); *State v. Mata*, 125 Ariz. 233, 241–42, 609 P.2d 48, 56–57, *cert. denied, Mata v. Arizona*, 449 U.S. 938, 101 S.Ct. 338, 66 L.Ed.2d 161 (1980). We find no error.

**6. IS ARIZONA'S DEATH PENALTY STATUTE UNCONSTITUTIONAL BECAUSE IT SHIFTS THE BURDEN OF PROOF REGARDING MITIGATING CIRCUMSTANCES TO THE DEFENDANT?**

Defendant contends that in Arizona, the death penalty is unconstitutional because it impermissibly shifts the burden of proof regarding mitigating circumstances to defendant. This issue has also been rejected numerous times by this court. *State v. Correll*, 148 Ariz. 468, 483, 715 P.2d 721, 736 (1986); *State v. Smith*, 125 Ariz. 412, 416, 610 P.2d 46, 50 (1980). We find no error.

**7. IS ARIZONA'S DEATH PENALTY STATUTE UNCONSTITUTIONAL BECAUSE IT VIOLATES DEFENDANT'S SIXTH AMENDMENT RIGHT TO A JURY TRIAL ON THE ISSUE OF THE SENTENCE OF DEATH?**

Defendant asserts that the sixth amendment of the United States Constitution requires that a jury trial be held on the question of the existence or non-existence of both aggravating and mitigating factors.

It is further asserted that a jury trial is constitutionally required on the issue of the death sentence.

We have previously disposed of this question. *State v. Correll*, 148 Ariz. at 483–84, 715 P.2d at 736–37. We find no error.

**8. PROPORTIONALITY REVIEW**

We must also examine the cases to determine if the sentence imposed is proportional to other death penalties imposed in Arizona and other jurisdictions. In doing so, we must keep in mind that the death penalty is applied only to certain cases of first degree murder.

The legislature has made it clear that the death penalty is not to be imposed in every case of first degree murder. The death penalty is reserved for those cases where the manner in which the crime was committed raises it above the norm of first degree murders, or the background of the defendant places the defendant above the norm of first degree murderers.

*State v. Blazak*, 131 Ariz. 598, 604, 643 P.2d 694, 700, *cert. denied, Blazak v. Arizona*, 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982).

We also conduct a proportionality review in order to determine whether the imposition of the death penalty in this case violates the eighth amendment. The question is "whether the sentences of death are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant." *State v. LaGrand*, 153 Ariz. 21, 37, 734 P.2d 563, 579, *cert. denied, LaGrand v. Arizona*, 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987); *State v. Bracy*, 145 Ariz. 520, 538, 703 P.2d 464, 482 (1985), *cert. denied, Bracy v. Arizona*, 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986).

A similar case is *State v. Castaneda*, 150 Ariz. 382, 724 P.2d 1 (1986), where defen-

dant abducted and sexually assaulted two twelve-year-old boys, later killing one of the victims. This court found that the murder was committed in an especially cruel, heinous, and depraved manner, and that the death penalty was properly imposed. *Castaneda*, at 395, 724 P.2d at 14. Likewise, in *State v. Roscoe*, 145 Ariz. 212, 700 P.2d 1312 (1984), *cert. denied, Roscoe v. Arizona*, 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 525 (1985), defendant abducted, sexually assaulted, and strangled a helpless seven-year-old girl. This court found that the murder was committed in an especially cruel, heinous, and depraved manner and that the death penalty was properly imposed. *Roscoe*, 145 Ariz. at 226–227, 700 P.2d at 1326–1327. *See also, State v. Ortiz*, 131 Ariz. 195, 208, 639 P.2d 1020, 1027, *cert. denied, Ortiz v. Arizona*, 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982) (death penalty upheld where defendant inflicted multiple stab wounds in the neck and chest areas of the victim before pouring gasoline on her and igniting it). Most recently, the death penalty was affirmed in *State v. Beaty*, 158 Ariz. at 247, 762 P.2d at 534 (1988), involving the sexual assault and murder of a thirteen-year-old girl. We have also considered the following similar cases in which we found the death penalty properly imposed: *State v. Clabourne*, 142 Ariz. 335, 347–48, 690 P.2d 54, 66–67 (1984); *State v. Gillies*, 142 Ariz. 564, 570, 691 P.2d 655, 661 (1984), *cert. denied, Gillies v. Arizona*, 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985); *State v. Summerlin*, 138 Ariz. 426, 436, 675 P.2d 686, 696 (1983). In each of these cases the defendant both sexually assaulted and murdered the victim, and properly received the death penalty based upon a finding of one or more of the aggravating circumstances.

Additionally, we have considered cases where the death penalty was reduced to life imprisonment by this court. *See State v. Johnson*, 147 Ariz. 395, 710 P.2d 1050 (1985) (defendant did not create grave risk of danger to others or commit murder in a cruel, heinous or depraved manner and no other aggravating circumstances were present); *State v. McDaniel*, 136 Ariz. 188, 665 P.2d 70 (1983) (insufficient evidence that defendant intended to kill victim who was beaten and locked in trunk of car); *State v. Graham*, 135 Ariz. 209, 660 P.2d 460 (1983) (substantial mental impairment due to drug addiction, neurological problems, and brain damage; vulnerability to influence; lack of prior record of violence); *State v. Valencia*, 132 Ariz. 248, 645 P.2d 239 (1982) (youth of defendant); *State v. Watson*, 129 Ariz. 60, 628 P.2d 943 (1981) (change of character and goals while in prison; youth of defendant; murder occurred as a result of shootout begun by victim); *State v. Brookover*, 124 Ariz. 38, 601 P.2d 1322 (1979) (substantial mental impairment due to brain lesion). The facts in the instant case are not similar to these cases where we reduced the penalty from death to life imprisonment.

■ Based on our review of other decisions of this court, we believe that the circumstances of this murder indicate that it is above the norm of first degree murders. *See State v. Blazak*, 131 Ariz. 598, 604, 643 P.2d 694, 700, *cert. denied, Blazak v. Arizona*, 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982). We find that imposition of the death penalty is proportional to the penalties imposed in similar cases in this state.

In addition to making an independent determination of the propriety of the death sentence in Arizona, the court also conducts a proportionality review to determine whether the sentence of death is excessive or disportortionate to the penalties imposed in similar cases in other jurisdictions. *State v. Richmond*, 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976), *cert. denied, Richmond v. Arizona*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977).

We believe that the defendant's sentence is similar to the sentences received by other defendants for similar crimes committed against minors. *See generally, State v. Morales*, 32 Ohio St.3d 252, 513 N.E.2d 267, 276–277 (1987) *cert. denied, Morales v. Ohio*, 484 U.S. 1047, 108 S.Ct. 785, 98 L.Ed.2d 871 (1988); *State v. Simants*, 197 Neb. 549, 566, 250 N.W.2d 881, 891, *cert. denied, Simants v. Nebraska*, 434 U.S.

878, 98 S.Ct. 231, 54 L.Ed.2d 158 (1977), *State v. Loyd,* 489 So.2d 898, 906 (La.1986), *stay granted,* 491 So.2d 1348 (1984), *cert. denied, Loyd v. Louisiana,* 481 U.S. 1042, 107 S.Ct. 1984, 95 L.Ed.2d 823 (1987); *Davis v. State,* 477 N.E.2d 889, 900–901 (Ind.), *cert. denied, Davis v. Indiana,* 474 U.S. 1014, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985); *Adams v. State,* 412 So.2d 850, 855–857 (Fla.), *cert. denied, Adams v. Florida,* 459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982). In each of these cases the victims were children who were either sexually assaulted or cruelly beaten during the perpetration of the crime, and in each case the death penalty was imposed. We find that the disposition in the instant case is not disproportionate to sentences in other jurisdictions in capital cases involving the death of children.

### C. Post–Trial Issues

#### 1. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that he received ineffective assistance of counsel in the failure of counsel to object to various evidentiary rulings with resulting waiver. Specifically, defendant contends his counsel failed to move to strike the character evidence including testimony of the defendant's relationship with his wife, evidence that other persons thought the defendant had committed the crime, and the failure to object to evidence submitted as to defendant's reputation in prison for being untruthful. Defendant also challenges the allowance of evidence over objection that he had a prior felony conviction and had been imprisoned.

As we have stated:

In deciding whether trial counsel was ineffective and whether such ineffectiveness warrants a new trial, this court applies a two-pronged test: (1) was counsel's performance reasonable under all the circumstances, i.e. was it deficient? *State v. Nash,* 143 Ariz. 392, 694 P.2d 222 (1985) (applying to cases tried or pending on appeal on or after January 9, 1985), and (2) was there a "reasonable probability that but for counsel's unpro-

fessional errors, the result of the proceeding would have been different," the prejudice requirement. *State v. Lee,* 142 Ariz. 210, 214, 689 P.2d 153, 157 (1984) (quoting *Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698, (1984) (applied retroactively to cases after *State v. Watson,* 134 Ariz. 1, 653 P.2d 351 (1982)).

*State v. Salazar,* 146 Ariz. 540, 541, 707 P.2d 944, 945 (1985). As we noted in *State v. Beaty,* 158 Ariz. at 249, 762 P.2d at 536 (1988), in deciding an ineffectiveness claim, this court need not approach the inquiry in a specific order or address both prongs of the inquiry if the defendant makes an insufficient showing on one. *Salazar,* 146 Ariz. at 541, 707 P.2d at 945.

In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

*Strickland v. Washington,* 466 U.S. at 698, 104 S.Ct. at 2069.

■ In the instant case we apply the prejudice component first. Assuming that counsel's performance was ineffective and considering the totality of the evidence before the jury, we do not believe counsel's alleged errors in the allowance of evidence as to defendant's character have affected the result of the proceeding. *State v. Nirschel,* 155 Ariz. 206, 209, 745 P.2d 953, 955 (1987). We find no error.

### D. Holding

We have reviewed the record for fundamental error pursuant to A.R.S. § 13–4035, *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) and *State*

*v. Leon,* 104 Ariz. 297, 451 P.2d 878 (1969). We find none.

The conviction and judgment of death is affirmed.

GORDON, C.J., FELDMAN, V.C.J., and HOLOHAN and MOELLER, JJ., concur.

## SUPPLEMENTAL OPINION

MOELLER, Justice.

Following issuance of our opinion in this case, the defendant moved for reconsideration. The motion contends:

1. Federal constitutional law precludes this court from holding Fulminante's coerced confession to Anthony Sarivola, a government agent, to be harmless error;

2. Even assuming a coerced confession may properly be declared harmless, the court's harmless error analysis was incorrect;

3. We erred by concluding that the second confession was not fruit of the poisonous tree;

4. We erred by rejecting defendant's ineffective assistance of counsel claim;

5. We erred by declaring Arizona's death penalty statute constitutional;

6. We erred in our analysis of the statutory aggravating circumstance of "especially cruel, heinous and depraved";

7. We improperly conducted our proportionality review.

We find no merit to any of the issues raised in the motion for reconsideration except the first. In our original opinion, we concluded that the state had not overcome Fulminante's prima facie showing of the involuntariness of his original confession to Sarivola, and, therefore, the statement to Sarivola should have been suppressed. However, we held the later, similar, and more explicit confession to Donna Sarivola was not fruit of the poisonous tree, and as such was properly admitted. Thus, we concluded that any error in the admission of the Sarivola confession was harmless beyond a reasonable doubt.

To support that conclusion, we cited four federal circuit cases and one Arizona case, all holding that where a second confession was properly received, the improper admission of an earlier confession was harmless error.

In his motion for reconsideration, however, the defendant correctly pointed out that the cases we relied upon to support our harmless error analysis were not cases in which the first confession was a coerced confession in violation of defendant's fifth amendment rights. Instead, these cases involved confessions obtained in violation of defendant's *Miranda* rights.

There is an unbroken line of authority supporting the rule that, although the receipt of a confession obtained in violation of *Miranda* may be harmless, the harmless error doctrine does not apply to coerced confessions. *See, e.g., Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290, 303–04 (1978); *Chapman v. California,* 386 U.S. 18, 23 n. 8, 87 S.Ct. 824, 828 n. 8, 17 L.Ed.2d 705, 710 n. 8 (1967); *Jackson v. Denno,* 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908, 915 (1964); *Payne v. Arkansas,* 356 U.S. 560, 568, 78 S.Ct. 844, 850, 2 L.Ed.2d 975, 981 (1958); *Miller v. Dugger,* 838 F.2d 1530, 1535 n. 10 (11th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988); *Johnstone v. Kelly,* 808 F.2d 214, 218 (2d Cir.1986), *cert. denied,* 482 U.S. 928, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987); *United States v. De Parias,* 805 F.2d 1447, 1456 (11th Cir.1986); *Williams v. Maggio,* 727 F.2d 1387, 1389 (5th Cir. 1984); *United States v. Davis,* 617 F.2d 677, 695–96 (D.C.Cir.1979); *see also* W. LaFave & J. Israel, 3 Criminal Procedure 277 (1984); Y. Kamisar, W. LaFave & J. Israel, Modern Criminal Procedure 849; *Project: Eighth Annual Review of Criminal Procedure: United States Supreme Court and Court of Appeals 1977–78,* 67 Geo.L.J. 317, 402 (1978).

The state urges us to ignore these cases and instead refers us to a few other cases, none of which persuade us that a coerced

confession can be harmless error.[1] It is clear that federal constitutional law, as interpreted, pronounced, and applied by the United States Supreme Court and other federal courts compels us to conclude that the receipt of the original coerced confession may not be considered harmless error.

The dissent to this supplemental opinion urges that coerced confessions may sometimes be considered harmless error.[2] The dissent, however, concedes that three decisions of the United States Supreme Court (*Mincey, Jackson, and Payne*) "have actually held that the admission of coerced confessions cannot be considered harmless error." Supplemental opinion at 264, 778 P.2d at 629 (Cameron, J., dissenting). The dissent, nevertheless, argues that because those cases involve facts more egregious than those presented by today's case, the words of the Supreme Court might not apply here. We cannot agree.

The dissent's argument is based on the view that the coerced confession here is "at most, a confession obtained surreptitiously through an informant." *Id.* at 268, 778 P.2d at 633. We believe that is a mischaracterization of the coerced confession involved in this case. As the original opinion in this case points out:

> Defendant contends that because he was an alleged child murderer, he was in danger of physical harm at the hands of other inmates. Sarivola was aware that defendant faced the possibility of retribution from other inmates, and that in return for the confession with respect to the victim's murder, Sarivola would protect him. Moreover the defendant maintains that Sarivola's promise was "extremely coercive" because the "obvious" inference from the promise was that his

life would be in jeopardy if he did not confess. We agree.

161 Ariz. at 243, 778 P.2d at 608.

Thus, it is clear, and we have already expressly held, that the confession was obtained as a direct result of extreme coercion and was tendered in the belief that the defendant's life was in jeopardy if he did not confess. This is a true coerced confession in every sense of the word. *See Oregon v. Elstad,* 470 U.S. 298, 312, 105 S.Ct. 1285, 1295, 84 L.Ed.2d 222, 234 (1985) (implicitly recognizing coercion may exist where police use any "deliberate means calculated to break the suspect's will," even absent physical violence or impairment). Therefore, we believe that we are compelled to reject the argument that its admission was mere harmless error.

The law, as declared by the Supreme Court, is that a harmless error analysis is inapplicable to coerced confessions. A confession extracted by a government agent in return for a promise of protection from violence at the hands of other prisoners is undoubtedly a coerced confession. Therefore, until and unless the Supreme Court changes the law, we must order defendant retried without the use of the coerced confession.

Therefore, the defendant's conviction and sentence are set aside, and this case is remanded for a new trial without the use of the original coerced confession. Of course, this supplemental opinion does not preclude the use of defendant's second confession, since we adhere to our original view that it was not the fruit of the poisonous tree. Other than the single point discussed in this supplemental opinion, all other aspects of the original opinion remain intact.

---

**1.** The state did refer us to one case that held that the harmless error doctrine applied to coerced confessions; however, that court recognized the weight of authority contrary to its position, but contended that the contrary authority did not necessarily establish a per se rule. *Harrison v. Owen,* 682 F.2d 138, 140 (7th Cir.1982). Because the holding in *Owen* is not supported by legitimate authority and does not provide analysis of its own, we do not consider it persuasive.

**2.** The dissent cites *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972), to support the proposition that the harmless error analysis applies to non-brutal, non-egregious coerced confession cases. However, the fact is that *Milton* was decided on sixth amendment-*Massiah* principles, to which the harmless error rule applies. Thus, *Milton* is inapposite.

GORDON, C.J., and FELDMAN, V.C.J., concur.

HOLOHAN, J., participated in this matter but retired prior to the filing of this supplemental opinion.

CORCORAN, J., did not participate in the determination of this matter.

CAMERON, Justice, dissenting.

I dissent. I believe the harmless error doctrine can be applied in this case. Admittedly, this view is a change from a previously held position. I believe, however, that changes in the law now allow the harmless error doctrine to be applied to coerced but reliable confessions.

At the time of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and *Harrington v. California,* 395 U.S. 250, 87 S.Ct. 1726, 23 L.Ed.2d 284 (1969), two leading United States Supreme Court cases on the exclusionary rule, it was generally assumed that confessions given in violation of *Miranda* were subject to the harmless error doctrine. The same could not be said for coerced confessions.

The introduction of involuntary or coerced confessions clearly calls for automatic reversal regardless of the amount of other evidence indicating guilt....

... The Supreme Court has settled it as the law that involuntary confessions call for automatic reversal because the right not to be forced to testify against one's self is "basic to a fair trial." The Court may have been concerned about the likelihood that an accused may make an untrue confession in order to escape mental or physical abuse at the hands of his interrogators. It is likely that the Court felt that coerced confessions, although extremely unreliable, could have a determinative effect on the minds of the jurors, and thus felt it the safer rule to require reversal in all cases, rather than draw fine lines concerning the quantum of additional evidence necessary to render the error "harmless."

Cameron & Osborne, *When Harmless Error Isn't Harmless,* 1971 LAW & SOC. ORD. 24, 29–30. At this time, however, I question the blanket assumption that the admission of any coerced confession is per se harmful and therefore reversible.

In the instant case, the majority has stated that the erroneous admission of defendant's first confession to Sarivola, which was held to be involuntary, cannot be considered harmless error. The majority states, "there is an unbroken line of authority supporting the rule that ... the harmless error doctrine does not apply to coerced confessions." To support this proposition, the majority cites United States Supreme Court and other federal cases.

The federal cases cited by the majority are not sound authority for its ruling. *Miller v. Dugger,* 838 F.2d 1530, 1535–37 (11th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988), involved a confession obtained in violation of *Miranda,* not a coerced confession. The court in *Miller* held that the defendant's confession was voluntary. *Johnstone v. Kelly,* 808 F.2d 214, 218 (2d Cir.1986), *cert. denied,* 482 U.S. 928, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987), held that it was improper to apply a harmless error analysis to a denial of the right of self-representation. In dicta, the court merely cited *Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958), for the proposition that harmless error does not apply to coerced confessions. *United States v. De Parias,* 805 F.2d 1447, 1456 (11th Cir.1986), *cert. denied, Ramirez v. United States,* 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987), was not a coerced confession case either. The court found the confession to be voluntary, but in dicta cited *Mincey v. Arizona* as authority that harmless error does not apply to coerced confessions. *Williams v. Maggio,* 727 F.2d 1387, 1389–90 (5th Cir.1984), involved only a claim that the confession was involuntary, which the court found to be unsupported by any evidence. Here too, the court in dicta cited *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), as authority that harmless error does not apply to coerced confessions. Finally, in *United States v. Davis,*

617 F.2d 677, 695–96 (D.C.Cir.1979), the court in dicta referred to *Mincey* and *Jackson* as holding that a coerced confession would require reversal. The court found, however, that the confession in question was voluntarily given.

Thus, of the citations given as support, only three have actually held that the admission of coerced confessions cannot be considered harmless error. *Mincey*, 437 U.S. at 398, 98 S.Ct. at 2416; *Jackson*, 378 U.S. at 376–77, 84 S.Ct. at 1780–81; *Payne*, 356 U.S. at 568, 78 S.Ct. at 850. Of these three cases, only *Mincey* is a post-*Chapman*, post-*Miranda* case. All of these cases involved confessions obtained under circumstances that resulted in the defendant being in a weakened, vulnerable physical condition and the police using coercive pressure through intensive interrogation to elicit a confession.

In *Payne*, a pre-*Chapman* case, a "mentally dull" youth was arrested for murder without a warrant, denied a hearing and not informed of his right to remain silent or his right to counsel. 356 U.S. at 567, 78 S.Ct. at 849–50. The defendant was held incommunicado for three days during which family members who requested to see him were turned away and he was refused permission to make a phone call. *Id.* at 563, 78 S.Ct. at 848. The defendant was denied food for over twenty-five hours and then only given two sandwiches and not fed again for another fifteen hours. *Id.* at 564, 78 S.Ct. at 848. The police told the defendant that thirty to forty people were waiting outside to get him. *Id.* A police officer told the defendant that if he would make a confession he would try to keep the mob away from him. *Id.* The Court found that because of the totality of this course of police conduct and particularly the culminating threat of mob violence, the confession had been coerced and did not constitute an "expression of free choice." *Id.* at 567, 78 S.Ct. at 850.

In *Jackson*, a pre-*Miranda*, pre-*Chapman* case, the defendant was involved in a gun battle with police after he robbed a hotel clerk. 378 U.S. at 370–71, 84 S.Ct. at 1777. He was shot twice, but managed to get to a hospital. *Id.* Jackson made incriminating statements to a detective and then hospital personnel gave him demerol, an analgesic sedative, and scopolamine, a drug used to dry up mouth secretion in preparation for surgery. *Id.* at 371, 84 S.Ct. at 1778. Police continued to interrogate him even though by this time Jackson had lost 500 cc. of blood. *Id.* At one point Jackson said, "Look, I can't go on;" however, police continued to question him. *Id.* An hour after the questioning, doctors operated on him. *Id.* at 371–72, 84 S.Ct. at 1778. The Court reversed the denial of defendant's habeas corpus petition and remanded the case to the district court to allow the state a reasonable time to afford him a hearing on the voluntariness of his confession or a new trial. *Id.* at 391, 84 S.Ct. at 1788. The Court recognized that the facts could be interpreted to find that the confession was coerced as a result of the police tactics. *Id.* at 391, 84 S.Ct. at 1788.

In *Mincey*, the defendant had unbearable pain in his leg, was in intensive care in the hospital and was depressed to the point of coma. *Mincey*, 437 U.S. at 398, 98 S.Ct. at 2416–17. The defendant was lying on his back, encumbered by tubes, needles, and breathing apparatus. *Id.* at 399, 98 S.Ct. at 2417. He clearly expressed his wish not to be interrogated. *Id.* When the detective began the interrogation, the defendant wrote: "This is all I can say without a lawyer." *Id.* The detective continued the interrogation despite Mincey's pleas to stop.

> Moreover, he complained several times that he was confused or unable to think clearly, or that he could answer more accurately the next day. But despite Mincey's entreaties to be let alone, [Detective] Hust ceased the interrogation only during intervals when Mincey lost consciousness or received medical treatment, and after each such interruption returned relentlessly to his task. The statements at issue were thus the result of virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness.

*Mincey,* 437 U.S. at 400–01, 98 S.Ct. at 2418.

The Court said it was apparent that the defendant's statements were not the product of his free and rational choice. "Due process of law requires that statements obtained as these were cannot be used in any way against a defendant at his trial." *Mincey,* 437 U.S. at 402, 98 S.Ct. at 2418.

In each of these three "coerced confession" cases, the defendant was in a physically distraught condition, which the police took advantage of by interrogating the defendant despite the defendant's indications that he did not want to make a statement or confess. In each case, the Supreme Court recognized that coercion is more than police brutality, it can also result from relentless interrogation inflicted on a defendant in a physically-weakened condition. Thus *Payne, Jackson,* and *Mincey* stand for the proposition that in these types of situations, confessions obtained by these means amount to coerced confessions that are not admissible and are not subject to the harmless error doctrine.

There have been, however, several cases involving involuntary confessions, sometimes characterized as "coerced," in which courts have applied a harmless error analysis. These confessions were considered coerced only in a technical sense and did not involve the egregious police methods or brutality characteristic of the true "coercion" cases. *See, e.g., Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (assuming, *arguendo,* that confession obtained by police officer posing as an accused person confined in ·defendant's cell should have been excluded, record clearly revealed that any error in its admission was harmless beyond a reasonable doubt).

Federal circuit courts have also considered this issue in several cases. *See United States v. Carter,* 804 F.2d 487 (8th Cir.1986) (assuming defendant's statements were involuntary because police detective misled defendant into thinking that he was being questioned for an assault, not a murder, court concluded that their admission into evidence was harmless error beyond a reasonable doubt); *Harrison v. Owen,* 682 F.2d 138 (7th Cir.1982) (admission of involuntary confession induced by alleged police representation that "consideration" would be given to defendant held to be harmless beyond a reasonable doubt); *Meade v. Cox,* 438 F.2d 323, 325 (4th Cir.1971) (despite a dispute in the record about the voluntariness of the statement, court finds its admission to be harmless error); *United States ex rel. Moore v. Follette,* 425 F.2d 925, 928 (2d Cir.1970), *cert. denied,* 398 U.S. 966, 90 S.Ct. 2180, 26 L.Ed.2d 550 (1970) ("While the case where admission of an improperly obtained confession can be considered harmless error is exceedingly rare, this is one.").

State courts, including this court, have held the erroneous admission of involuntary confessions to be harmless error. *State v. Castaneda,* 150 Ariz. 382, 387, 724 P.2d 1, 6 (1986) (admission of defendant's statement regarding whereabouts of victim's body induced by police telling defendant they would bring his sister to the site if he refused to tell them where the body was, may have amounted to coercion, but any error in failing to suppress the statement was harmless beyond a reasonable doubt); *People v. Gibson,* 109 Ill.App.3d 316, 64 Ill.Dec. 787, 440 N.E.2d 339 (1982) (defendant's incriminating statements given to his cellmate, a government informant who was also a convicted felon, were improperly admitted, but in view of other testimony, it was only cumulative and the error was harmless); *Kelley v. State,* 470 N.E.2d 1322 (Ind.1984) (even if the defendant's statements were involuntary, reversal not required because any error in the admission of the challenged statements would be harmless); *People v. Ferkins,* 116 A.D.2d 760, 497 N.Y.S.2d 159 (1986) (court finds state did not prove admissions to be voluntary, however any error in their admission was harmless given the cumulative nature of the statements); *State v. Johnson,* 35 Wash.App. 380, 666 P.2d 950 (1983) (admission of defendant's written statement, which he alleged had been coerced, was harmless in any event); *State v. Dean,* 363 S.E.2d 467 (W.Va.1987) (confession induced by promise of receiving psychiatric

treatment considered involuntary, but its admission into evidence was harmless beyond a reasonable doubt).

I recognize the authority of *Payne, Jackson* and *Mincey;* however, I do not find the rule regarding involuntary confessions to be as clear cut as the majority makes it appear. *See United States v. Murphy,* 763 F.2d 202, 208 (6th Cir.1985), *cert. denied, Stauffer v. United States,* 474 U.S. 1063, 106 S.Ct. 812, 88 L.Ed.2d 786 (1986) ("The Supreme Court has not squarely addressed the issue of whether admission of an involuntary confession may be harmless since its landmark holding in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), that a federal constitutional error can be held harmless.").

Two courts have addressed the issue of an involuntary confession induced by some type of promise and found the erroneous admission of the statements to be harmless error. In *State v. Dean,* an arson investigator investigated a fire in defendant's room at the YMCA. 363 S.E.2d 467, 468 (W.Va.1987). By interviewing the defendant, the investigator learned that defendant was depressed and contemplating suicide. *Id.* He agreed to help defendant get psychiatric treatment and made inquiries on defendant's behalf. The investigator accompanied defendant to the Mental Health Center and upon arrival, defendant admitted to him that he had been involved in several other fires. *Id.* The trial court ruled that the statements were inadmissible because they had been induced by the investigator's promises to assist defendant in getting psychiatric treatment. *Id.* at 469. Nonetheless, the West Virginia Supreme Court said:

> We are aware that error in the admission of a coerced confession is not ordinarily subject to harmless error analysis. *See Rose v. Clark,* [478] U.S. [570], 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). A rare exception to this rule has been recognized, however, where the involuntary confession is merely duplicative of other testimony or admissible statements of the accused. *Harrison v. Owen,* 682 F.2d 138 (7th

> Cir.1982); *Meade v. Cox,* 438 F.2d 323 (4th Cir.), *cert. denied,* 404 U.S. 910, 92 S.Ct. 234, 30 L.Ed.2d 182 (1971); *United States ex rel. Moore v. Follette,* 425 F.2d 925 (2d Cir.), *cert. denied,* 398 U.S. 966, 90 S.Ct. 2180, 26 L.Ed.2d 550 (1970); *State v. Johnson,* 35 Wash.App. 380, 666 P.2d 950 (1983). *See also Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); *United States v. Murphy,* 763 F.2d 202 (6th Cir.1985), *cert. denied,* 474 U.S. 1063, 106 S.Ct. 812, 88 L.Ed.2d 786 (1986); *State v. Castaneda,* 150 Ariz. 382, 724 P.2d 1 (1986). The standard for review in such cases is the same as in other cases of error of constitutional magnitude: " 'Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt.' Syl. pt. 5, *State ex rel. Grob v. Blair,* 158 W.Va. 647, 214 S.E.2d 330 (1975)." Syllabus point 1, *Maxey v. Bordenkircher,* —— W.Va. ——, 330 S.E.2d 859 (1985).

*State v. Dean,* 363 S.E.2d at 471 (footnote omitted).

In *Harrison v. Owen,* the defendant called his friend, told him he was involved in a killing and asked for advice. 682 F.2d 138, 139 (7th Cir.1982). His friend negotiated with police and told defendant that the police promised "considerations and leniencies" if defendant would come forward and surrender. *Id.* Upon signing his confession, the police told him they couldn't come right out with a deal, but consideration would be given to him later. *Id.* The court found that the admission of defendant's incriminating statement was harmless beyond a reasonable doubt in light of the evidence as a whole and testimony by defendant's friend and the police corroborating the incriminating statements. *Id.* at 142.

I find the analysis employed by the Eighth Circuit to be persuasive. The court recognized that a harmless error analysis should not apply only to certain types of coerced confessions. *United States v. Carter,* 804 F.2d 487 (8th Cir.1986). In *Carter,* an FBI agent misled the defendant

about the subject of the interrogation. He told the defendant that he was investigating an assault, although he was actually investigating a murder. 804 F.2d at 489. The defendant gave a false alibi that was later used to impeach his credibility. *Id.* When he found out the victim had died, he invoked his right to remain silent. *Id.* The court held that even assuming the statement was involuntary, the error in admitting it was harmless. *Id.* The court noted:

> *Flittie v. Solem,* 775 F.2d 933, 944 & n. 18 (8th Cir.1985) (en banc), *cert. denied,* [475] U.S. [1025], 106 S.Ct. 1223, 89 L.Ed.2d 333 (1986), is not to the contrary. In *Flittie* we said: "If the statements were coerced, their admission could not have been harmless error." *Ibid.* Only if the word "coerced" is read to include deception, as opposed to physical or mental compulsion, would the harmless-error analysis be inappropriate in the present case. Such an extended reading of *Flittie* is not tenable, and would be contrary to *Milton v. Wainwright, supra.*

*Carter,* 804 F.2d at 489 n. 3.

This meaning of "coerced" is consistent with the United States Supreme Court's interpretation in footnote one of *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986), which discusses various confession cases where police conduct was coercive. The Court found that all the cases it had considered in the last fifty years involved defendants who were in weakened physical conditions and/or subjected to intensive and relentless police interrogation or coercive tactics. The Court also noted in footnote two that "[e]ven where there is causal connection between police misconduct and a defendant's confession, it does not automatically follow that there has been a violation of the Due Process Clause." *Connelly,* 479 U.S. at 164 n. 2, 107 S.Ct. at 520 n. 2; *see Oregon v. Elstad,* 470 U.S. 298, 305, 105 S.Ct. 1285, 1290, 84 L.Ed.2d 222 (1985)

(fifth amendment not concerned "with moral and psychological pressures to confess emanating from sources other than official coercion."); *see also United States v. Murphy,* 763 F.2d 202, 210 (6th Cir.1985) (court applies harmless error analysis to confession where there was an element of coercion, but no police misconduct).

A case similar to the present case is *People v. Gibson,* 109 Ill.App.3d 316, 64 Ill.Dec. 787, 440 N.E.2d 339 (1982). A government informant, also a convicted felon, was deliberately placed in defendant's jail and was asked by police if he would "pay attention" to anything the defendant might say regarding the murder. *Id.* at 322–23, 64 Ill.Dec. at 791–92, 440 N.E.2d at 343–44. With his identity unknown to the defendant, the informant gained defendant's confidence and elicited incriminating statements from him. *Id.* at 323, 64 Ill. Dec. at 792, 440 N.E.2d at 343. The court found the admission of the informant's testimony regarding defendant's statements to be clear error, but in view of the other testimony in the case, it was only cumulative, and the evidence, taken together, overwhelmingly established the defendant's guilt without the informant's testimony. Accordingly, the court held that the erroneous admission of the testimony was harmless beyond a reasonable doubt. *Id.* at 324, 64 Ill.Dec. 793, 440 N.E.2d at 344.

A review of the case law mandates that a court should look to the circumstances surrounding the involuntary confession. If the confession was a result of the type of coercion found in *Payne, Jackson* and *Mincey,* then admission of the incriminating statement will constitute reversible error. If, however, the involuntary confession is only "coerced" in a technical sense, and is merely duplicative of other testimony or admissible statements of the defendant, then a harmless error analysis is appropriate.[3] Additionally, if the record reveals

---

**3.** For cases holding that harmless error analysis is appropriate in involuntary confession cases if the statement is cumulative of other testimony or evidence against the defendant see *Harrison v. Owen,* 682 F.2d 138, 141 (7th Cir.1982); *Meade v. Cox,* 438 F.2d 323, 325 (4th Cir.1971);

*People v. Gibson,* 109 Ill.App.3d 316, 324, 64 Ill.Dec. 787, 792, 440 N.E.2d 339, 344 (1982); *Kelley v. State,* 470 N.E.2d 1322, 1325 (Ind. 1984); *People v. Ferkins,* 116 A.D.2d 760, 763, 497 N.Y.S.2d 159, 162 (1986); *State v. Johnson,*

overwhelming evidence of defendant's guilt, any error in admitting such statements may be considered harmless.[4]

The confession in the present case, although considered involuntary, is not the type of "coerced" confession found in *Payne, Jackson* and *Mincey.* The record does not reflect that defendant was in any type of weakened condition when he confessed to Sarivola. Although Sarivola was a paid FBI informant, he was not a police officer. Police did not intentionally place Sarivola in defendant's cell. Rather, Sarivola had heard rumors that defendant was suspected of killing a child and told his FBI contact about it. Only then did the FBI agent tell Sarivola to find out about the rumor. The evidence does not indicate that the FBI agent ever told Sarivola to offer protection to defendant or threaten him in any way if defendant refused to divulge any information. The Arizona authorities were not involved at this time.

Sarivola did not subject defendant to any coercive, intensive interrogation. While defendant might not have confided in Sarivola had he known the information would be passed on, he did voluntarily tell Sarivola, in conversational tones, the circumstances surrounding the murder of his stepdaughter. This "involuntary" confession to Sarivola is not the type of coerced confession found in the cases of egregious police conduct the Supreme Court has addressed when it refused to apply the harmless error doctrine. It was at most, a confession obtained surreptitiously through an informant.

I believe defendant's "coerced" confession is merely cumulative to other admissible statements made by the defendant. Defendant's second confession to Donna Sarivola contained much of the same information as his confession to Anthony Sarivola. He told both of them that he killed his stepdaughter, choked her, and made her beg for her life. He also expressed his hatred for his stepdaughter to each of them by telling Anthony Sarivola he "hated" her and referred to the victim as a "little fucking bitch" and by telling Donna Sarivola he wanted to "piss on her [the victim's] grave."

This is also a case where the record reflects overwhelming evidence of defendant's guilt. Defendant made inconsistent statements concerning the victim's disappearance. He said that he had a good relationship with the victim and that she had been instructed in the use of firearms. Defendant's wife contradicted these statements by testifying that he had a poor relationship with the victim and that the defendant had never instructed the victim in the use of firearms. The evidence indicated that the day before defendant reported the victim's disappearance, he went to a Mesa gun shop to trade his rifle for an extra barrel for his .357 revolver. The evidence showed that the victim had been shot twice with a .357 revolver. Other physical evidence such as the wounds, ligature around the victim's neck, motorcycle tracks and the location of the crime scene all linked defendant to the murder.

The evidence, taken together, established defendant's guilt beyond a reasonable doubt without the use of defendant's confession to Sarivola. Thus, in light of all these facts and the absence of coercive police tactics in this case, I believe that the erroneous admission of defendant's involuntary confession to Sarivola was harmless beyond a reasonable doubt. The law does not require nor do the circumstances justify reversing his conviction on this ground.

35 Wash.App. 380, 386, 666 P.2d 950, 953 (1983); *State v. Dean,* 363 S.E.2d 467, 471 (W.Va.1987).

**4.** For cases holding that harmless error analysis is appropriate in light of overwhelming evidence of the defendant's guilt see *Milton v. Wainwright,* 407 U.S. 371, 372–73, 92 S.Ct. 2174, 2175–76, 33 L.Ed.2d 1 (1972) (three other confessions); *United States v. Carter,* 804 F.2d 487, 490 (8th Cir.1986) (six witnesses against defendant); *United States v. Murphy,* 763 F.2d 202, 203, 210 (6th Cir.1985) (massive circumstantial and corroborating evidence); *United States ex rel. Moore v. Follette,* 425 F.2d 925, 928 (2d Cir.1970) (other confession, corroborating testimony from other witnesses covering every element of the crime, finding of stolen property in defendant's possession); *State v. Castaneda,* 150 Ariz. 382, 387, 724 P.2d 1, 6 (1986) (positive identification by witness and physical evidence connecting defendant to crime).

Apart from the facts in this case, I find no reason in logic or law to hold that a "coerced" confession can never be harmless. It cannot be said that there will never be a case in which facts are so overwhelming against a defendant that the error is not harmless beyond a reasonable doubt.

Further, I do not believe we can ignore the cost of applying the exclusionary rule in this case. The "coercion" in this case was not great. Comparing the costs and benefits, the costs are too great and the benefits negligible. Were I deciding this case on independent state grounds, I believe the cost of excluding the "coerced" confession is too great a price to pay for the meager benefit obtained. *See* Cameron & Lustiger, *The Exclusionary Rule: A Cost–Benefit Analysis*, 101 F.R.D. 109 (1984).